**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

|  |  |
|---|---|
| **MOBILITY WORKX, LLC,** | **FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER** |
|       **Plaintiff,** | |
|   v. | **Case No. 4:17-CV-00872 ALM** |
| **CELLCO PARTNERSHIP D/B/A VERIZON WIRELESS** | |
|       **Defendant.** | **JURY TRIAL DEMANDED** |

## MOBILITY WORKX LLC'S OPPOSITION TO VERIZON WIRELESS'S MOTION FOR SUMMARY JUDGMENT

**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS ................................................................................................... i

TABLE OF AUTHORITIES .......................................................................................... iii

TABLE OF EXHIBITS ................................................................................................... iv

I.    INTRODUCTION ...............................................................................................1

II.   STATEMENT OF ISSUES TO BE DECIDED ..................................................1

III.  STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUMF") ...................2

IV.   SUMMARY JUDGMENT STANDARD ............................................................8

      A.    The Two-Step Analysis For Patent Infringement .......................................8

V.    SUMMARY JUDGMENT OF NO LITERAL INFRINGEMENT IS IMPROPER
      WITH RESEPCT TO THE '417 PATENT BECAUSE A MATERIAL ISSUE OF
      FACT EXISTS REGARDING VERIZON'S LITERAL INFRINGEMENT OF
      THE ASSERTED CLAIMS OF THE '417 PATENT ...........................................9

      A.    There Is Ample Evidence From Which A Reasonable Jury Can Conclude
            That The Accused Verizon LTE Network Includes "A Ghost Mobile
            Node" As Recited In The Asserted Claims Of The '417 Patent ...............10

      B.    There Is Ample Evidence From Which A Reasonable Jury Can Conclude
            That The "Ghost Mobile Node" In The Accused Verizon LTE Network
            "Trigger[s] Signals Based On A Predicted Physical Location Of [The]
            Mobile Node Or Distance With Relation To At least One Foreign Agent"
            As Recited In Claim 1 Of The ' 417 Patent ...............................................23

      C.    There Is Ample Evidence From Which A Reasonable Jury Can Conclude
            That The Accused Verizon LTE Network "Determin[es] A Distance … To
            a Closest Foreign Agent With Which The Mobile Node Can Complete A
            Handover" As Required By Claim 7 of the '417 Patent ...........................24

      D.    There is Ample Evidence From Which A Reasonable Jury Can Conclude
            That The Accused Verizon LTE Network Meets All of the Limitations of
            Claim 4 of the '417 Patent .......................................................................24

VI.   SUMMARY JUDGMENT OF NO LITERAL INFRINGEMENT IS IMPROPER
      WITH RESEPCT TO THE '330 PATENT BECAUSE A MATERIAL ISSUE OF
      FACT EXISTS REGARDING VERIZON'S LITERAL INFRINGEMENT OF
      THE ASSERTED CLAIMS OF THE '330 PATENT ...........................................25

**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**

A.    There Is Ample Evidence From Which A Reasonable Jury Can Conclude That The Accused Testing Services Employs a Network Emulator that Includes "a Plurality of Fixedly-Located Wireless Network Nodes" As Recited In Claim 1 Of The '330 Patent ....................................................25

B.    There Is Ample Evidence From Which A Reasonable Jury Can Conclude That The Accused Testing Services Employs a Network Emulator that Tests "Mobile Node[s] Configured to Wirelessly Communicate With … Wireless Network Nodes" as Recited In Claim 1 Of The '330 Patent ......28

VII.   CONCLUSION ....................................................................................30

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

## TABLE OF AUTHORITIES

**CASES**                                                                      **PAGE**

*Advanced Medical Optics, Inc. v. Alcon Inc.*,                                    9
    361 F. Supp. 2d 404, 411 (D. Del. 2005)

*Armco, Inc. v. Cyclops Corp.*, 791 F.2d 147, 149 (Fed. Cir. 1986)              11

*Celotex Corp.v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548 (1986).           8

*Cybor Corp.v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (*en banc*)   9

*Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 758 (Fed. Cir. 1984)        9

*Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1361 (Fed. Cir. 1983)),   9

*Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1332            9
    (Fed. Cir. 2001)

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995)       8
    (*en banc*), aff'd, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

*Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574,         8
    587-88 (1986)

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097,  8
    147 L.Ed.2d 105 (2000)

*Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576            9
    (Fed. Cir. 1995).

*Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323              9
    (Fed. Cir. 2001).

*Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1160 (Fed. Cir. 1998).                  9

**OTHER AUTHORITIES**

Fed.R.Civ.P.56(c)                                                                8

**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**

**TABLE OF EXHIBITS**

| Exhibit | Description |
|---------|-------------|
| 1 | U.S. Patent No. 8,213,417 |
| 2 | U.S. Patent No. 7,231,330 |
| 3 | Dr. Sukumaran Nair's Curriculum Vitae |
| 4 | Updated Expert Report of Sukumaran Nair dated June 20, 2019 |
| 5 | July 4, 2019 Rebuttal Expert Report of James A. Proctor, Jr., M.S.E.E. Regarding Non-Infringement of the Asserted Claims ("Proctor Rebuttal Report") |
| 6 | Mr. Proctor's Drive Test Report, Exhibit 2, to the Proctor Rebuttal Report |
| 7 | 3GPP TS 36.331 |
| 8 | Deposition of Paul Venizelos |
| 9 | Venizelos Exhibit 27 |
| 10 | 3GPP TS 365.300 v.10.12.0 |
| 11 | 3GPP TS 36.331 v.08.06 |
| 12 | 3GPP TS 36.341 |
| 13 | 3GPP TS 36.401 V8.6.0 |
| 14 | 3GPP TS 36.423 V.8.3.0 |
| 15 | 3GPP TS 36.331 V 10.7.0 |
| 16 | 3GPP TS 365.101 |
| 17 | List of Equipment authorized for use on the Verizon Network – MZVW00000001-MZZVW00000023 |
| 18 | Verizon Test Plan – LTE AT Commands for Test Automation MZVW00000189 – MWVZ00000298 |
| 19 | Verizon Requirement Plan -- LTE 3GPP Band13 NetworkAccess MZVW00001843-MWVZ00002092 |
| 20 | CTIA Test Plan for Wireless Device Over-the-Air Performance MZVW00002180-MWVZ00002770 |
| 21 | Verizon Test Plan  Entitled LTE Over the Air Radiated Performance Test Plan MZVW00001078-MZVW00001099 |
| 22 | Verizon SUPRFCONF13 Test Plan MZVW00000090-MZVW00000169 |
| 23 | Verizon MZVW00000170-MZWV00000180 |
| 24 | Verizon Test Plan LTE Band 13 Throughput MZVW00000299-MWVZ00000616 |
| 25 | Excerpt from E. Dahlman, S. Parkvall, J. Skold, "4G: LTE/LTE-Advanced for Mobile Broadband," 2nd Ed. Academic Press (2014), which Mr. Proctor produced at PROCTOR_00000009 - PROCTOR_00000542 |

**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**

| Exhibit | Description |
|---------|-------------|
| 26 | Excerpt from LTE for UMTS OFDMA and SC-FDMA Based Radio Access, Edited by Harri Holma and Antti Toskala, both of Nokia Siemens Networks, Finland, John Wiley & Sons, Ltd. (2009), which Mr. Proctor produced at PROCTOR_00001161 - PROCTOR_00001610 |
| 27 | Errata Sheet form Dr. Hernandez's deposition |
| 28 | Exhibit 3 to Venizelos Deposition MWVZ00000031-MWVZ00000089 Verizon Test Plan: LTE 3GPP Band 13 Supplementary RRM Conformance |
| | Declaration of Michael Machat In Support of Mobility Workx, LLC's Opposition To Verizon's Motion for Summary Judgment ("Machat Decl.") |
| | Declaration of Dr. Sukumaran Nair In Support of Mobility Workx, LLC's Opposition to Verizon's Motion for Summary Judgment ("Nair Decl.") |

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

## I.   <u>INTRODUCTION</u>

Defendant Verizon moves for summary judgment of non-infringement as to all of the asserted claims of U.S. Patent Nos. 8,213,417 ("the '417 patent") and 7,231,330 ("the '330 patent"). (Dkt. 95.)  Verizon's motion should be denied, because material issues of fact preclude summary judgment of non-infringement as to both asserted patents.

The Court construed "ghost mobile node" to mean "a node, or a virtual node, that can operate on behalf of the mobile node ***and that is capable of*** registering with a foreign agent and allocating resources for the mobile node before the mobile node arrives in the ***physical area covered by the foreign agent***."  (Dkt. 74, at 6.)  There is no reasonable dispute that the "ghost mobile node" limitation is satisfied by the accused Verizon LTE network.  Material issues of fact exist as to the other issues raised by Verizon as well.

Also, as discussed below, Verizon's arguments regarding no literal infringement of the '330 patent fail, as even their own 30(b)(6) witness acknowledges that Verizon infringes the patent.  Mobility's expert Dr. Suku Nair confirms this to be true as well as Verizon's own documents confirm this to be true as well.

## II.   <u>STATEMENT OF ISSUES TO BE DECIDED</u>

Mobility does not oppose the statement of the issues to be decided with one exception, namely Issue No. 1.  Issue No. 1 should be reframed as: Whether the Accused Network contains a "ghost-mobile node" as required by all asserted claims of the '417 Patent.

The Court construed the term "ghost-mobile node" as a "a node, or a virtual node, that can operate on behalf of the mobile node and that is capable of registering with a foreign agent and allocating resources for the mobile node before the mobile node arrives in the physical area

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

covered by the foreign agent."  (Dkt. No. 74 at 6.)  Verizon's inclusion of the issue of whether the Accused Network has a "ghost-mobile node" thus creates confusion, because there is no ghost-mobile node if it does not meet the Court's claim construction, yet the way that Verizon posed the issue suggests that there are ghost-mobile nodes that do not comply with the Court's construction.

## III.    STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUMF")

Mobility does not oppose Defendant's SUMFs 1-12, 14, or 17-24.

Mobility disputes the accuracy of Defendant's SUMF 13.  Defendant states that "[t]he term "eNodeB" refers to the base station equipment in a cellular network often associated with cell towers."  Defendant cites Dkt. 64, 9 fn. 2 for support.  However, fn 2 on page 9 of Dkt. 65 does not even mention the words "eNodeB" or base station.  And while a base station is a possible implementation of an eNodeB, it is not the same as an eNodeB.  An accurate description of an "eNodeB" is found in E. Dahlman, S. Parkvall, J. Skold, "4G: LTE/LTE-Advanced for Mobile Broadband," 2nd Ed. Academic Press at (2014), which Mr. Proctor produced at PROCTOR_00000009 - PROCTOR_00000542 and a copy of relevant portions of which are attached to the Machat Declaration as Exhibit 25.  In relevant part, this reference provides:

> The LTE radio-access network uses a flat architecture with a single type of node—the eNodeB. The eNodeB is responsible for all radio-related functions in one or several cells. It is important to note that an eNodeB is a logical node and not a physical implementation. One common implementation of an eNodeB is a three-sector site, where a base station is handling transmissions in three cells, although other implementations can be found as well, such as one baseband processing unit to which a number of remote radio heads are connected. One example of the latter is a large number of indoor cells, or several cells along a highway, belonging to the same

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

eNodeB. ***Thus, a base station is a possible implementation of, but not the same as, an eNodeB.***[1]

Exhibit 25 at PROCTOR_00000153.

Mobility also disputes SMUF 15. The first sentence of the SMUF is accurate; Mobility and Dr. Nair do contend that certain aspects of two handover procedures performed in the Verizon LTE Network infringe the '417 Patent. The two subsequent sentences contain inaccuracies, in that Defendant refers to the two procedures as a "handover event." (*See* Defendant SMUF 15.) In fact, however, the accused X2 handover and S1 handover are "procedures" as noted in the first sentence of SUMF 15. Each of those handover procedures include a handover preparation phase, handover execution phase, and handover completion phase. (Exhibit 4 at ¶ 203; Exhibit 5 at ¶¶ 43-44, 51-54; Nair Decl. at ¶ 20.)

Mobility disputes Defendant' SMUF 16 in that the second sentence is an incomplete characterization of the A3 event. As explained by Dr. Nair, the A3 entering and leaving events are mathematically defined in the LTE Technical Specification 3GPP TS 36.331 v10.7.0, Section 5.5.4.4. (Nair Decl. ¶ 29, 85.). As indicated in the excerpt of the Technical Specification copied in the Nair Decl. following ¶ 85, the mathematical equation of the A3 entering event is:

$$Mn + Ofn + Ocn - Hys > Mp + Ofp + Ocp + Off \qquad (1)$$

(*Id.* at 85; *see also* ¶ 29.)

Equation (1) can be simplified to the following equation:

$$Mn > Mp + S \qquad (2)$$

---

[1] Emphasis added unless otherwise indicated.

-3-

**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**

where $S = Ofp + Ocp - Ofn - Ocn + Off + Hys$.  (Nair Decl. at ¶¶ 30, 86.)  The value of $S$ represents the sum of individual cell and frequency offsets ($Ofp$, $Ocp$, $Ofn$, and $Ocn$), the a-3 offset ($Off$), and the hysteresis value ($Hys$).  (*Id.*)  The value of "$S$" can be a negative number. (*Id.* at ¶¶ 30 ,88-90.)  When "$S$" is a negative value, an A3 event will be detected by the UE when the measured RSRP (or RSRQ) of the neighbor cell is greater than the measured RSRP (or RSRQ) of the serving cell ***less the value of S*** (*e.g.,* when RSRPn > RSRPs +(-$S$)).  (*Id.*)  In other words, the A3 event will be detected by the UE when the measured RSRP (or RSRQ) of the neighbor cell ***plus*** the value of $S$ is greater than the measured RSRP (or RSRQ) (*i.e.,* when RSRPn + $S$ > RSRPs (or if the UE is instructed to monitor RSRQ, when RSRQn + $S$ > RSRQs). (*Id.*)  As a result, the A3 Event may be triggered when the signal strength and/or quality of a neighboring eNodeB ***is less than*** the signal strength of the source eNodeB.  (*Id.*; *see also* Nair Decl. at ¶ 84.)  Dr. Nair also declared that his analysis of the A3 Event equation and its various parameters in, as well as his review of Mr. Proctor's Drive Test, confirms that the source eNodeBs (ghost mobile node) in the accused Verizon LTE Network are "***capable of*** registering with a foreign agent and allocating resources for the mobile node ***before the mobile node arrives in the physical area covered by the foreign agent***," even under Mr. Proctors definition of "physical area covered by the foreign agent.  (Nair Decl. at ¶¶ 34; 75-106.)

Mobility dispute the implications of Defendant's SUMF 25 and 26.  Defendant refers to single references of the Infringement Contentions that they take out of context from the whole, as is their strategy.  They dissect sentences into parts, and discard the part that is contrary to their argument (see discussion of SUMF 30, *infra*) and proceed as if it doesn't exist.  They take a picture or two from the Infringement Contentions and ignore the other pictures in the

-4-

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Infringement Contentions.  For example, Page 13 of the Infringement Contentions displays a chart showing how defendants infringe.  Page 8, Objective One accuses Defendant's Open Development Device Process, and Page 4 specifically says, Plaintiff accuses Defendant's Testing Service and Systems of infringement of the Asserted Claims of the Patent-in-Suit, as well as all other substantially similar services."  But even with respect to the pictures defendant relies upon, as their 30b6 witness testified, a device may be tested wirelessly even though a one part of the equipment in the room – a part not being tested – may have a wire.  (See discussion Section 6B infra.)

Mobility disputes the accuracy of Defendant's SUMF 28.  Defendant writes that Dr. Nair's report does not contain any analysis regarding whether any of the alleged wireless network nodes are "fixedly-located" as required by Claim 1.  Dr. Nair addresses Claim 1 in his report.  He identifies all of the claim elements step by step in his expert report and concludes that defendant is infringing the patents.  With regards to fixedly-located, Dr. Nair addresses this head on in his accompanying declaration at paragraphs 156 to 160.

Moreover, see Dr. Nair's Infringement Report ¶¶ 68 - 72 on page 19, where Dr. Nair analyzes how the "fixedly located" distinction helps identify the invention to a more traditional commercial mobile communications network where there are fixed base stations/cell towers in set geographical locations connected by large transmission lines or mechanisms. (See also Dr. Nair Decl ¶¶ 171 – 174.)

Dr. Nair, in his infringement expert report, also analyzes at ¶ 86, page 26, how the elements of Claim 1 related to "the plurality of fixedly-located wireless network nodes configured to variably adjust" are recited in Verizon's test cases [Venezelos Deposition Exhibit

**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**

MWVZ00000037 –MWVZ00000042, authenticated by Mr. Venezelos at 90:1 -91:9 and attached to Machat Decl as Exhibit 28] where Multiple Wireless Network nodes in the Verizon Testing System are used for testing several use cases. For instance Band 13 Testing, IMS testing, and others require the use of several eNodeBs wirelessly communicating packet data while adjusting power levels in Cell #1, #2, and #3.

Mobility disputes the implications of Defendant's SUMF 29 as the statement cited by Verizon is simply irrelevant. *See* Nair Decl. ¶ 161 (referring to Verizon's star witness stating several times that in order for a manufacturer to launch a device on the Verizon wireless network it has to follow Verizon's written specification). (*See* Machat Decl, Ex 8, Venezelo's Deposition at 54:21-55:20; and 62:25 – 63:20; and 142:16 – 144:6; and 216:25 – 217:9.)

Nevertheless, Dr. Nair actually does an analysis regarding the Spirent AirAccess CDMA Newtork Emulation Manual. *See* ¶ 97 at page 36 of his infringement expert report, *"Each cell, or SS1, SS2, SS3 are the Foreign Agents or a Wireless Network Nodes described in the patent. The SS1, SS2, SS3 implemented by Spirent and ROHDE Schwarz, ANITE, and other vendors as presented the document calledv"LTE_3GPP_Band_13_Test_Equipment_List_June2013" (MWVZ0000001-00000036)."*

Also on page 38 of the same report, Dr. Nair also shows, as Figure 11, all Spirent Test Equipment used by Verizon.

Mobility disputes the accuracy of Defendant's SUMF 30. Verizon simply break a sentence into two parts, taking the first part out of context and try to imply that Verizon only do

-6-

**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**

conductive tests,[2] whereas clearly Verizon conduct radiated tests (which by definition must be without wires) and conductive tests. Dr. Nair's report at ¶ 30 states, "Further, Verizon does radiated tests. Radiated means without wires or cables, and conductive is taking the wireless signal as close as possible to the phone's antenna or antenna(s). In radiated tests, the last portion of connectivity is wireless in nature thus satisfying the court definition of wireless network node." Dr. Nair cites to the Bate Stamped document MWVZ00000139 which was identified and authenticated by Verizon's 30(b)(6) witness Paul Venizelos. (*See* Machat Decl ¶23)

Mobility disputes the accuracy of Defendant's SUMF 31 and 32. Dr. Hernandez corrected his deposition testimony to correct hurried answers to trick questions. The questions posed to him were done without proper context, so Dr. Hernandez's initial response was reflect that. However, when asked in context, of course something that is moving can be set in a particular location, such as a Ferris Wheel or an exercise bike, or the earth which always revolves around the sun in a fixed orbit. Similarly, out of context, there is a meaningful distinction between wired and wireless, but placed in proper context with Verizon's NDET lab,

---

[2] The complete sentence was, "However, using a conductive test is equivalent to a wireless test as both achieve the same end goal of controlling attenuation, and Signal to Noise Ratio." By omitting the second half of the sentence, Verizon seeks to mislead the reader. Of course Dr. Nair knows the difference between conductive and radiated tests, and he discusses how Verizon test both ways, with and without wires, in his Declaration accompanying this Opposition. (*See* Nair Decl ¶ 186 ("Clearly, a conducted test, as Verizon described with a "Wire" refers to connecting a coaxial cable to the UE's (a cellphone's) Antenna Port. Radiated test cases refer to wirelessly testing.") (*See also*, Nair Decl. ¶ 181 ("Indeed as I point out in ¶ 112 of my Updated Expert Report, Verizon states in their specification document Exhibit 14 to Machat Decl at MWVZ00002050 that "All transmitter signal quality and transmission emissions requirements defined in 3GPP TS 36.101 . . . shall be met both conducted (at the UE Antenna Port ) and radiated.").) According to Verizon's terminology, "conducted" refers to wired, and radiated means "without wires." (*See* generally, Nair Decl ¶¶ 178 -186.)

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

there is no meaningful distinction.  Like a cellphone that occasionally needs to be charged via a

cable.  Whether the cellphone is charged with a wireless charger or a USB cable, it really makes

little difference to the functionality.  It's more about convenience. *See* also Nair Decl ¶167 in

agreement.

## IV.    SUMMARY JUDGMENT STANDARD

Summary judgment is not appropriate unless the court determines there are no genuine

issues of material fact and the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P.

56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548 (1986).  In determining

whether there is a triable issue of material fact, the court must review the evidence and construe

all inferences in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co.,*

*Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  However, a court should not make

credibility determinations or weigh the evidence.  *Reeves v. Sanderson Plumbing Prods., Inc.*,

530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).  To defeat a motion for summary

judgment, the non-moving party "must set forth specific facts showing that there is a genuine

issue for trial." Fed.R.Civ.P. 56(c).  Where the record taken as a whole could lead a rational trier

of fact to find for the non-moving party, there is a genuine issue for trial.  *Matsushita Elec. Ind.*

*Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

### A.    The Two-Step Analysis For Patent Infringement

A patent infringement analysis involves two steps: claim construction and then

application of the construed claim to the accused processor product.  *Markman v. Westview*

*Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*), aff'd, 517 U.S. 370, 116 S.Ct.

1384, 134 L.Ed.2d 577 (1996).  The first step, claim construction, is purely a matter of law.  *See*

**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**

*Cybor Corp.v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (*en banc*).  The second

step, application of the claim to the accused product, is a factual inquiry.  *See Kustom Signals,*

*Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1332 (Fed. Cir. 2001) (Patent infringement,

"whether literal or under the doctrine of equivalents, is a question of fact.").

      "To establish literal infringement, every limitation set forth in a claim must be found in

an accused product, exactly."  *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570,

1576 (Fed. Cir. 1995).  An accused device infringes under the doctrine of equivalents if it

possesses all of the limitations of the claim either literally or equivalently.  *Tronzo v. Biomet,*

*Inc.*, 156 F.3d 1154, 1160 (Fed. Cir. 1998).

      Although Mobility, as the plaintiff, patent owner, must prove infringement by a

preponderance of the evidence, *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 758 (Fed. Cir.

1984) (citing *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1361 (Fed. Cir. 1983)),

Verizon, to prevail on its motion for summary judgment, must prove that it does not practice at

least one of the limitations in each asserted claim of the '417 and '330 patents.  *See Advanced*

*Medical Optics, Inc. v. Alcon Inc.*, 361 F. Supp. 2d 404, 411 (D. Del. 2005).  Conversely, to

withstand summary judgment, Mobility must show that there is a genuine issue of material fact

with regard to the elements Verizon argues it does not practice.  *See id.*  In other words, summary

judgment of non-infringement is appropriate *only* when it is apparent that a reasonable jury could

reach but one conclusion regarding infringement.  *See Telemac Cellular Corp. v. Topp Telecom,*

*Inc.*, 247 F.3d 1316, 1323 (Fed. Cir. 2001).

**V.**    **SUMMARY JUDGMENT OF NO LITERAL INFRINGEMENT IS IMPROPER**
      **WITH RESEPCT TO THE '417 PATENT BECAUSE A MATERIAL ISSUE OF**

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

## FACT EXISTS REGARDING VERIZON'S LITERAL INFRINGEMENT OF THE ASSERTED CLAIMS OF THE '417 PATENT

The declaration and expert report of the Mobility's expert, Dr. Suku Nair, submitted herewith, together with their referenced exhibits and other evidence made of record, are more than sufficient to meet Mobility's obligation to demonstrate a material issue of fact exists for each ground on which a Defendant has moved.  These materials provide proof that each limitation of the asserted claims is found in the accused products.[3]  A detailed analysis of Verizon's non-infringement arguments and the evidentiary conflicts that exist in the record that foreclose summary judgment of non-infringement are discussed below.

### A.  There Is Ample Evidence From Which A Reasonable Jury Can Conclude That The Accused Verizon LTE Network Includes "A Ghost Mobile Node" As Recited In The Asserted Claims Of The '417 Patent

Defendant Verizon asserts that summary judgment is proper because the accused Verizon LTE Network does not include "a ghost-mobile node."  Defendant is not only wrong, but relies on statements taken out of context and a misleading declaration from its expert, Mr. Proctor, in the process.  The simple fact of the matter is that (1) Dr. Nair's analysis of Mr. Proctor's Drive Test (Exhibit 6 hereto) that he provided with his July 4, 2019, Rebuttal Report ("Proctor Rebuttal Report") (Exhibit 5 hereto), and (2) Dr. Nair's analysis of the mathematical inequality that defines the A3 handover event each individually confirm that Verizon and Mr. Proctor's position is without merit and that, at a minimum, an issue of fact exist as to whether the Verizon LTE

---

[3] *See* June 20, 2013 Updated Expert Report of Dr. Sukumaran Nair ("Exhibit 4") at §§ VII, VIII.B., XI, and XII; Nair Decl. at §§ II-V.

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Network includes eNodeBs that satisfy the ghost-mobile node limitation.  (*See* Nair Decl. at §
III.A.)

The Court construed "ghost mobile node" to mean "a node, or a virtual node, that can
operate on behalf of the mobile node ***and that is capable of*** registering with a foreign agent and
allocating resources for the mobile node before the mobile node arrives in the ***physical area
covered by the foreign agent***."  (Dkt. 74, at 6.)  There is no reasonable dispute that the "ghost
mobile node" limitation is satisfied by the accused Verizon LTE network.  Mobility has provided
ample evidence from which a reasonable jury could find, under the Court's definition of "ghost
mobile node," that Defendant's LTE Network includes at one ghost mobile node.

SMUF 14 provides:  "The term 'handover' refers to a series of network operations
designed to allow for call or data continuity when, in LTE for example, a mobile device such as a
smartphone is moving and is going from the coverage area of one eNodeB to the coverage area
of another eNodeB."  This admission alone is sufficient to create an evidentiary conflict that
precludes summary judgment on the "ghost-mobile node"  *See Armco, Inc. v. Cyclops Corp.*, 791
F.2d 147, 149 (Fed. Cir. 1986) ("The party opposing [a] motion [for summary judgment] is
required merely to point to an evidentiary conflict created on the record.").  It provides a factual
basis from which a reasonable juror could conclude that the source eNodeBs (ghost-mobile
node) within the Verizon LTE Network must necessarily be capable of registering the mobile
node with the target eNodeB (foreign agent) and allocating resources for the mobile node before
the mobile node actually arrives in the physical area covered by the foreign agent and the
handover to the target eNodeB is made.  (*See* SUMF 14.) How else could the handover
successfully work, particularly at high rates of mobility?

-11-

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Defendant and its expert Mr. Proctor assert that in both the accused X2 and S1 handover processes, the reallocation of resources and handover only occur reactively **after** the mobile device arrives in in the physical area covered by the target eNodeB.[4]  (Dkt. No. 95 at 9.) Defendant's position is based on four underlying components.  (1) Dr. Nair has identified the source eNodeB as satisfying the ghost mobile node limitation; (2) Dr. Nair has identified the Handover Request that the source eNodeB (ghost-mobile node) sends to the target eNodeB (foreign agent) as meeting the required limitation that the eNodeB "operate on behalf of the mobile node and that it is **capable of registering** with the foreign agent and allocating resources **before the mobile node arrives in the physical area covered by the foreign agent;**" and (3) the Handover Request is sent from the source eNodeB to the target eNodeB after the mobile node (UE) sends a Measurement Report to the source eNodeB informing it that the mobile node has detected a handover event, such as an A3 event; and (4) the mobile node sends the Measurement Report when the A3 event is triggered and "[t]he A3 event is triggered when the radio signal of the neighboring cell (n-cell) is better than the serving cell (s-cell) by a threshold." (Dkt. No. 95 at 10-12.)

---

[4] Defendant can't seem to keep its facts straight.  It asserts that "Dr. Nair does not explain whether his analysis of the "ghost mobile node" limitation applies to the X2 handover event, the S1 hand over event, or both."  (Dkt. No. 95 at 16.)  Yet, in Defendant's SUMF 15, Defendant asserts that Mobility and Dr. Nair have accused both the X2 and S1 handover procedures. Defendant's position is also not supported by the record.  Dr. Nair explained the X2 and S1 handover procedures in his Updated Expert Report and how the source eNodeB acts as the "ghost-mobile node" within the Verizon LTE Network in both the X2 and S1 handover procedures.  (*See* Nair Decl. ¶¶ 19-20.)  Dr. Nair also explained the salient differences between X2 and S1 handovers for purposes of the asserted claims of the '417 patent. (*Id.* at 21.)

**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**

Defendant's position is without merit for a several reasons.  First, it is contradicted by the details of the mathematical inequality that defines the A3 handover event.  (Nair Decl. at ¶¶ 23-31; ¶¶ 83-91.)  Second, it is contradicted by Dr. Nair's analysis of the Drive Test that Defendant's Expert, Mr. Proctor performed.  (Nair Decl. at ¶¶ 31-34; ¶¶ 78-82, 93-103.)

As explained by Dr. Nair, the A3 entering and leaving events are mathematically defined in the LTE Technical Specification 3GPP TS 36.331 v10.7.0, Section 5.5.4.4.  (Nair Decl. ¶ 29, 85.).  The mathematical equation of the A3 entering event is:

$$Mn + Ofn + Ocn - Hys > Mp + Ofp + Ocp + Off \qquad (1)$$

(*Id.* at 85; *see also* ¶ 29.)

Equation (1) can be simplified to the following equation:

$$Mn > Mp + S \qquad (2)$$

where $S = Ofp + Ocp - Ofn - Ocn + Off + Hys$.  (Nair Decl. at ¶¶ 30, 86.)

The LTE Specifications provide that the different parameters that make up $S$ may very as follows:  a3-offset (or *Off*) can range from -30 to 30, values corresponding to -15 dB to 15 dB; hysteresis (or *Hys*) can range from 0 to 30, values corresponding to 0 to 15 dB; and *Ocn, Ofn, Ofp, Ocp* (the cell specific parameters) can range from -24dB to 24dB.[5]  (Nair Decl. ¶ 88.)  Given the potential values of the cell specific parameters and *Off*, they can have a huge impact on the overall value of "$S$" and ultimately whether the value of $S$ is positive number or a negative number and how positive or negative.  (Nair Decl. ¶ 89). When "$S$" is a negative value, an A3

---

[5] The values of each of the cell specific parameters included in the A3 mathematical formula not only change from cell to cell within the Verizon LTE Network, but they also change for individual cells over time as the network is constantly optimizing the parameters based on feedback it receives from within the network.  (Nair Decl. at ¶ 87, fn 12.)

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

event is actually detected by the UE when the measured RSRP (or RSRQ) of the neighbor cell is greater than the measured RSRP (or RSRQ) of the serving cell **less the value of S** (*e.g.,* when RSRPn > RSRPs +(-*S*)).  (*Id.* at 90.)  As a result, contrary to Verizon and Dr. Proctor's position, the A3 Event may be triggered when the signal strength and/or quality of a neighboring eNodeB **is less than** the signal strength of the source eNodeB.  (*Id.* at ¶¶ 30 ,88-90; *see also* Nair Decl. at ¶ 84.)

Dr. Nair's analysis of Mr. Proctor's "sanitized" Drive Test Data attached as Exhibit 2 to his Rebuttal Report also confirms that A3 events are being be triggered within the Verizon LTE Network when the signal strength and/or quality of a neighboring eNodeB **is less than** the signal strength of the source eNodeB:

> Mr. Proctor does not discuss this simple mathematical concept in the Proctor Rebuttal Report or his Drive Test.  Rather he just refers to individual cell offset variables without discussing what the value of those parameters may be or how those parameters may change the point where an A3 event is detected and a Measurement Report is sent.  (*See, e.g.,* Machat Decl., Exhibit 6 at 13 ("Therefore, each measurement report triggered by event A3 would require that the target cell be between 4 to 6 dB better than the service cell (then adjusted for cell instance offset values, where applicable)."))  Nor did Mr. Proctor include the individual cell offset parameters that the mobile phone (UE) was instructed to use by each RRCConnectionReconfiguration Message provided by the serving eNodeB as part of the HANDOVER COMAND during the previous handoff event in his drive test data (even though this data would have been included in the data he captured).  (*See id.* at 8 ("this file contains all of the RRC messages, and other log messages, related to the configuration and mobility").)  Based on my analysis of Mr. Proctor's Drive Test (Exhibit 2 to his Rebuttal Report) in Section III.B. [sic, III.A.] *infra*,  **I can only conclude that Mr. Proctor did not provide this recorded data related to the cell specific parameters because it would have shown that value of S was negative for some, if not all, of the A3 events detected in Mr. Proctor's Drive Test.   This would mean that for at least some of the A3 events recorded in Mr. Proctor's Drive Test, if not all, the serving cell had a greater measured RSRP than the target neighbor cell at the time the A3 event was reported to the serving cell's (or source) eNodeB.** (*See* ¶¶ 89 - 101, *infra*)

(Nair Decl. at ¶ 31.)

-14-

**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**



*Figure 23. X2 Handover - Handover Preparation and Handover Execution*

Figure 23 above is reproduced from page 11 of Dr. Nair's Declaration.  It reflects the handover preparation and handover execution phases of an X2 handover.  (Nair Decl. ¶¶ 20-23)  The original Figure appeared in Dr. Nair's Updated Expert Report and has been annotated by Mr. Proctor to highlight the handover event triggering the Measurement Report and by Dr. Nair to identify the point in the handover process where Mr. Proctor reports the measured signal strength (RSRP) and signal quality (RSRQ) values for the Source eNodeB and Target eNodeB in his Drive Test, which is discussed in more detail below.  (*Id.* at ¶¶ 24-25, 33.)

-15-

**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**

In the initial step shown in Figure 23, the mobile node reports the detection of a handover event, such as an A3 handover event, to the source eNodeB (ghost mobile node) through a Measurement Report.  (*Id*. at ¶¶ 22-24)  Subsequently, the source eNodeB sends a Handover Request to the target eNodeB (foreign agent), which preregisters and allocates resources for the mobile node with the target eNodeB before it arrives in the physical area covered by the target eNodeB.  (*Id*. at ¶¶ 34-52; *see also* excerpt of Section 8.2.1.2 from 3GPP TS 36.423 V.8.3.0 on page 24 of Nair Decl.)

Defendant's expert, Mr. Proctor performed a Drive Test with the ostensible purpose of showing that the A3 handover events in the Verizon LTE Network are triggered when the signal strength and/or signal quality of a neighboring eNodeB ***is greater than*** the signal strength (or quality) of the source eNodeB and hence Verizon can't infringe.  (*Id*. at ¶ 25.)  But, Dr. Nair's analysis of Mr. Proctor's "sanitized" Drive Test results revealed quite the opposite.

First, Mr. Proctor reported the measured signal strength (RSRP) and signal quality (RSRQ) values at the time the Handover Command was sent from the source eNodeB to the target eNodeB for the twenty handovers that occurred during his Drive Test.  (*Id*. at ¶¶ 32-33)  As shown in Figure 23, this is plainly after the Measurement Report was received from the mobile node by the source eNodeB.  (*Id*. at ¶ 33.)  It was also after the Handover Request (*id.)*, which the eNodeB sends to register the mobile node with the target eNodeB and reserve resources (*id*. at ¶¶ 34-52; *see also* excerpt of Section 8.2.1.2 from 3GPP TS 36.423 V.8.3.0 on page 24 of Nair Decl.)

Dr. Nair's analysis of Mr. Proctor's "sanitized" Drive Test results, also confirmed that that the "ghost-mobile node" limitation of the asserted claims of the '417 patent is ***satisfied.***  (*Id*.

-16-

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

at ¶ 78.)  Dr. Nair determined that the measured signal strength (RSRP) and signal quality (RSRQ) values that Mr. Proctor relies on to rebut Mobility's infringement case were all measured values from 9 seconds to over two and one half minutes after the triggering A3 event occurred.  (Nair Decl. ¶¶ 75-79.)  This analysis also confirmed that the measured signal strength and quality of the serving cell were actually greater than those of the neighbor cell at the time of the A3 triggering event, not less.  (Nair Decl. ¶ 81.)  Further, given that between 9 and 155 seconds of time elapsed between the recorded A3 Events and the Handover Command in each of handover event captured during Mr. Proctor's Drive Test, Dr. Nair concluded the A3 triggering event in each handover appeared to have occurred before the mobile node arrived in the physical area covered by the eNodeB of the neighbor cell, than happening after (as Verizon and Mr. Proctor contend).  (*Id.* at ¶ 82)  Indeed, the A3 mathematical function inherently provides a tool that allows the eNodeB and Verizon network to predict the location of the mobile node by having the mobile node provide a Measurement Report to the Source eNodeB when different handover events, such as an A3 event are detected, and further allows the network—through the selection of different values of the various parameters that collectively define the total offset value—to adjust where the handoff preparation process begins between neighboring cells throughout the Verizon and thus the corresponding scope of coverage each cell provides in the Verizon LTE Network.  (*Id.* at ¶ 83.)

To illustrate this point and confirm that Verizon and Mr. Proctor's assertions about the "capabilities" of the eNodeBs within the Accused Verizon Network are demonstrably false, a very simplified simulation of two cells was prepared, in which the base stations were set at a radius 1600 meters apart (or the cells were set to have 800 m radius).  (Nair Decl. ¶ 95. 97.)  The

**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**

simulation was designed to simulate the attenuation of instantaneous and L3 filtered signal strength values that a mobile node would observe at various points between a serving and a target cell.  (*Id.*)  This simulated where an A3 event would trigger based on different values of "$S$" in the A3 Event inequality defined by equation (2): $Mn > Mp + S$.  (*See Id.* at ¶¶ 99-105.)

In creating this simulation, an a3-offset of 6, which translates to 3dB, was used and a hysteresis (*Hys*) value of 2 that translates to 1 dB was used. (*Id.* at ¶ 95)  These are the same values Mr. Proctor states he observed during his drive test. (*Id.*)  In producing the simulation, a standard Radio Frequency fading path loss model downloaded from the FCC was used for a frequency corresponding to the Band 13 frequency in use in the Verizon LTE Network.  (*Id.* at 96.)  Further, a layer 3 (L3) filter coefficient of fc8 was used in this simulation (consistent with Verizon's test document requirements), instead of fc4 (which Mr. Proctor allegedly observed during his drive test).  (*Id.*)  Dr. Nair indicated, this would tend to delay (as opposed to speed up) the point where an A3 Event is detected because at k=4 only half of the filtered value is attributed to the instant measurement of signal strength.  (*Id.*)  By contrast at K=8 only 1/4th of the filtered value is attributed to the instant measurement of signal strength.  (*Id.*)  The higher the value of K, therefore, the more delayed the L3 filtered signal strength value will decay or rise as the mobile node moves within the network.

Although *"S"* can be a large negative number, the simulation showed that when "$S$" is set to just -2dB in equation (2) above, the A3 Event was satisfied for the L3 filtered data at around 560 m from the Source eNodeB on the left, and for unfiltered (instantaneous) values of signal strength (RSRP), the A3 Event was triggered at 670 m from the source node.  This is illustrated in the diagram below:

-18-

**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**



Signal Strength and A3 Event with S= -2dB



Signal Strength and A3 Event with S= - 5 dB

When "S" was set to -5dB in equation (2) above, the condition for the A3 Event was satisfied for the L3 filtered data at around 420 m from the Source eNodeB on the left, whereas

-19-

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

for the unfiltered (instantaneous) values of signal strength (RSRP), the A3 Event was triggered at 580 m from the source node on the left.

Given the potential values of a3-offset and the individual cell offsets under the LTE Specification (*see* Nair Decl. at ¶ 88), "S" can be a significantly large negative number.  (*Id.* at 106.)  In Dr. Nair's opinion, this straight forward simulation, confirms that the source eNodeBs (ghost mobile node) in the accused Verizon LTE Network are "***capable of registering*** with a foreign agent and allocating resources for the mobile node ***before the mobile node arrives in the physical area covered by the foreign agent***," even under Mr. Proctors definition of "physical area covered by the foreign agent."

Defendant also cites to Figure 19 (copied below) from the Nair Rebuttal Report (Exhibit 4 hereto).  (Dkt. No. 95 at 13.)  Contrary to Defendant's assertion, Figure 19 does not support its position.  "S" in equation (2) above is merely equal to *Offset + Hys* for the equation at the bottom of Figure 19 on page 79 of his Updated Expert Report.  (*Id.*)  And, as already noted above, it is possible for *S* to be negative, in which case, the handover event illustrated in Figure 19 would trigger before the red line crosses the blue line (i.e. while the neighbor eNodeB is less than the serving eNodeB).  (*Id.*)  Verizon and Mr. Proctor simply ignore the mathematic reality of the A3 Event in an effort to mislead the court as to the true meaning of the A3 Event inequality (*Mn > Mp + S*) and the fact that "S" can be a negative value. (*Id.* ¶¶ 28-31, 83-91.)

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY



Because Mobility has demonstrated above a material issue of fact with respect to literal infringement of the "ghost-mobile node" limitation, there is no need to address the limitation under the doctrine of equivalents.

Verizon and Mr. Proctor also assert:

> The meaning of "the physical area covered by the foreign agent" is not subject to reasonable debate.  The plain and ordinary meaning is the physical area within which a mobile device ***is able* to** receive service, characterized and evidenced by the mobile device's ability to send and receive signals with an eNodeB.

(Dkt. No. 95 at 13.)  Immediately after making this statement, however, Verizon and Mr. Proctor proceed to ignore their own "plain and ordinary meaning" by stating:

> It is beyond dispute that a mobile device can only measure the power of a neighboring cell after the mobile device is within "the physical area covered by the foreign agent," because you can only measure a signal if you are able to receive it.  If a mobile device can measure a signal from a base station, then it necessarily is in the "physical area covered by" the base station.

**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**

Thus, immediately after sting that that the plain and ordinary meaning of "physical area covered by the foreign agent" is not subject to reasonable debate, Verizon and Mr. Proctor ignored their own plain and ordinary meaning and came up with a second definition that only requires the mobile unit to be able to receive signals, and not actually communicate back with the tower. The simple fact of the matter is that a mobile unit broadcasts at a much lower power than a base station and thus as reflected by the simulation performed by Dr. Nair above, its signal will dissipate way before the signal strength of base station will dissipate. Thus, there are many situations were a signal may be able to be detected from a base station, but the mobile unit can't communicate with the base station.

Further, as Mr. Proctor states in paragraphs 63 and 64 of his Rebuttal Report:

63.    An RRC_IDLE state means that the radio connection is inactive. The UE mobility is not under control of the network and the UE does not need to send any measurement reports for updating, although it performs neighbor cell measurement for cell (re)selection. The UE will continue to monitor for incoming calls on the physical channel and system information broadcasted by the eNB.

64.    In the RRC_CONNECTED state the UE is able to send and receive data in the uplink and downlink transmission channels. It measures the downlink radio quantity of neighbor cells and sends RRC measurement reports according to the measurement configuration received from the MME.

(Exhibit 5 at ¶¶ 63, 64.) Further, Mr. Proctor criticizes Dr. Nair for using IDLE state functions in his analysis. (*See, e.g.,* Exhibit 5 at 211 ("SIB4 is only used in RRC_IDLE mode and relates only to cell reselection, not handovers."); see also ¶ 43 ("It should also be noted that handover is *only* performed in the RRC_CONNECTED state, whereas 'cell re-selection' is performed in the RRC_IDLE state. ***Thus, cell reselection does not involve the handover preparation phase and is not relevant to the accused handover processes.***") Despite stating that the RRC_IDLE mode is irrelevant to the handover process of the present claims, Verizon and Mr. Proctor now try to

-22-

**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**

define the "physical area covered by the foreign agent" based on the idle state of the phone rather than what it is in the RRC_Connected State, which is where handovers can occur. When the mobile unit is connected to the network such that it can have two way communications with the network during mobility (what the claims of the '417 patent are directed to), the plain and ordinary meaning of "physical area covered by the foreign agent" is simply the area that the network assigns the foreign agent to cover. (*See* Nair Decl. at ¶¶ 108-124.)

Finally, Mobility notes that throughout Verizon's analysis, it ignores a key issue, namely that the "ghost-mobile node" need only be "***capable of registering*** … and allocating resources before the mobile node arrives in the physical area covered by the foreign agent." No where does Verizon or Mr. Proctor address the capabilities of the eNodeB's as has Dr. Nair.

**B.    There Is Ample Evidence From Which A Reasonable Jury Can Conclude That The "Ghost Mobile Node" In The Accused Verizon LTE Network "Trigger[s] Signals Based On A Predicted Physical Location Of [The] Mobile Node Or Distance With Relation To At least One Foreign Agent" As Recited In Claim 1 Of The ' 417 Patent**

Dr. Nair confirms that this limitation is satisfied in the Verizon LTE Network. (Nair Decl. at ¶ 17.) In particular, the setting of the parameters for the A3-Event, also set a predicted physical location and distance from the target eNodeB (foreign agent) for the handover event to be triggered and signals to be sent. (Nair Decl. at 53-74, 80.) Not only because as illustrated in the simulations above, the A3 Event factors are uniquely informing the mobile node and the Network where it is in relation to the source and target eNodeBs, but also because the mobile node is also measuring radio signals of all eNodeBs in its vicinity and reporting those measurements to the Source eNodeB when it detects an A3 triggering event. (*Id.*) Thus, the mobile node is also simultaneously determining a distance to a closest foreign agent with which the mobile node can potentially complete a handover and reporting that to the Source eNodeB,

-23-

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

event thought the final decision to handover is still made by the source eNodeB. (*Id.*; *see also* ¶ 54.)

**C.** **There Is Ample Evidence From Which A Reasonable Jury Can Conclude That The Accused Verizon LTE Network "Determin[es] A Distance … To a Closest Foreign Agent With Which The Mobile Node Can Complete A Handover" As Required By Claim 7 of the '417 Patent**

Dr. Nair also analyzes and confirms that the Verizon's LTE Network performs the step of "determining a distance … to a closest foreign agent with which the mobile node can complete a handover" as recited in claim 7 of the '417 Patent. (*See* Nair Decl. at 138-154.) For example, distance is a function of signal strength. As a function of distance signal strength changes ('330 Patent 8:20-24 and 8:40-45), therefore by Verizon mapping signal strength to location, a distance is computed. (Nair Decl. ¶ 139.) Distance equals the square root of ((Location0x-Location1x)2 + (Location0y-Location1y)2 ). (*Id.* at ¶ 140.) Thus, simply by measuring the relative power levels of the detected signal strengths of neighboring eNodeBs, and forwarding that information to the source eNodeB, the mobile node is determining a distance. (*Id.*at 140) This is also inherently reflected in the mathematical inequality that defines the A3 event. (*Id.* at 141, 143.) Thus, there is a material issue of fact with this limitation.

**D.** **There is Ample Evidence From Which A Reasonable Jury Can Conclude That The Accused Verizon LTE Network Meets All of the Limitations of Claim 4 of the '417 Patent**

While Dr. Nair inadvertently referred to the limitation of the "ghost-mobile node" for claim 7 of the '417 patent through an inadvertent ministerial task of copying over the correct language for claim 4 does not alter his conclusion that the Verizon LTE Network satisfies all of the limitations of claim 4 of the '417 Patent. (Nair Decl. at ¶ 127.) Dr. Nair walks through all of the limitations and shows how each limitation of claim 4 is satisfied, including by much of the

-24-

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

analysis he previously conducted with respect to claims 1 and 7. (*Id.* at 125-137.) For example, One aspect that Claim 4 adds is the requirement for Advertisement messages from a foreign agent in the vicinity. Given that this is for the next handover, the RRC Connection Reconfiguration Message from the ghost mobile node or System Information Block4 (SIB4) can meet this limitation. (*Id.* at ¶ 126.) Further, the ghost-mobile node acts as a proxy for a mobile node the target eNodeB (foreign agent). (*Id.* at ¶ 128.) Thus this requirement is also met. Accordingly, Mobility has presented evidence from which a reasonable juror could conclude that Verizon infringes claim 4.

**VI.    SUMMARY JUDGMENT OF NO LITERAL INFRINGEMENT IS IMPROPER WITH RESEPCT TO THE '330 PATENT BECAUSE A MATERIAL ISSUE OF FACT EXISTS REGARDING VERIZON'S LITERAL INFRINGEMENT OF THE ASSERTED CLAIMS OF THE '330 PATENT**

**A.    There Is Ample Evidence From Which A Reasonable Jury Can Conclude That The Accused Testing Services Employs a Network Emulator that Includes "a Plurality of Fixedly-Located Wireless Network Nodes" As Recited In Claim 1 Of The '330 Patent**

Verizon's defense to the '330 Patent infringement hinges on semantics that ignore how things work in everyday life. For example, Verizon argues as if they've never visited an amusement park or been on a Ferris wheel. Obviously the Ferris wheel, as well as all the other rides, such as the roller-coasters are fixedly located on the ground, but yet portions of them move. Anyone wanting to go on one of the star attractions at the amusement park knows where to stand in line. On the next visit, the line and location of the attraction will be at the same spot. But they wait patiently to get on the ride that is fixedly located at that same spot so they can get a thrill as the ride vigorously moves around and around. The same analogy can be made with an exercise bike. Moreover, even the video submitted to the Court as Exhibit 12, shows a fixed

-25-

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

device wirelessly rotating.  Verizon's 30(b)(6) witness agrees.  (Exhibit 8 at 124:25 – 126:12.

Also please see Dr. Nair Decl ¶176.)

      Claim 1 of the '330 Patent recites "a plurality of fixedly-located wireless nodes

configured to variably adjust wireless communication characteristics."  (Exhibit 2 at Claim 1.)

As the specification makes clear, the antenna is just one component of the wireless node, just like

a car on a roller coaster is one component of the roller coaster or a rotating wheel is one

component of a stationary bike:

> The wireless nodes 105 each can include a wireless access point 130. By using actual hardware components instead of modeling the components, the complexity of coding algorithms and the computation time required to simulate wireless communication characteristics including, but not limited to, radio-wave fading, antenna propagation, or other base station implementation details can be avoided. The wireless access points 130 can be high frequency wireless entry points configured to communicate using any of a variety of different wireless communications protocols so as to communicate with the mobile nodes 125. Any suitable wireless communication protocol can be implemented using the access points 130 and the mobile nodes 125 and, as such, can be tested using the system 100. ***Each access point 130 can be a wireless access point having an antenna 140***. Each antenna 140 can be an omnidirectional antenna so as to model base station signal transmission and reception behavior. Accordingly, each access point 130 can receive wireless communications via its antenna 140 and forward received wireless communications over a wired

      There is nothing in the Court's claim construction that would require the fixedly-located

wireless nodes to also have a stationary antenna.  (*See* Dkt. No. 74 at 7 (providing "fixedly-

located" to mean set at a particular position.")  Here's what Verizon's 30(b)(6) witness had to say

about this matter:

Q. ████████████████████████████████████
████████████████████
████████████████████████████████████
████████████

-26-

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY



BY MR. MACHAT: Q.

A.

Q.

MR. BARTON:  Object to form.

THE WITNESS:

Just like the earth which rotates around the sun, it's all relative.  Step back and look from afar and you see that everything moves, even the earth.  Strict claim construction shouldn't mean one abandons common vernacular to reach absurd conclusions.  Of course, Mobility has shown the wireless network nodes are fixedly located while being tested.  They are not being tested while flying randomly around as they might without gravity.  No, instead, Verizon tests the devices within a specific part of their lab.

Also, it must be remembered that Wireless network nodes used in the Accused Testing Service are the exact same nodes used in a real  life LTE deployment - eNodeB's.  This real life equipment is not designed to operate as mobile equipment, and in fact in real life, this equipment requires fixed infrastructure for installation and configuration. Hence, by definition, it should follow that the alleged wireless network nodes are fixedly located. (*See* Dr, Nair Decl 159 -162.)

-27-

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

**B.  There Is Ample Evidence From Which A Reasonable Jury Can Conclude That The Accused Testing Services Employs a Network Emulator that Tests "Mobile Node[s] Configured to Wirelessly Communicate With … Wireless Network Nodes" as Recited In Claim 1 Of The '330 Patent**

Continuing with their war on ordinary meaning of words and phrases, Verizon boldly

asserts that Mobility has failed to show that any wireless network node "wirelessly

communicate[s]" with any wireless network node.  Again, Verizon's 30(b)(6) witness, Paul

Venizelos, testified differently, admitting that Verizon conducts wireless tests in its NDET[6] lab.



Also, two pages later, Mr. Venizelos testified:

_____

[6] Mr. Venizelos uses the acronym NDET to refer to the Network Device Evaluation Testing lab where he works.

-28-

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Significantly, Mr. Venizelos, didn't agree with Verizon's contentions that a simple wire connected to a wireless phone made it inaccurate to say the wireless phone being tested was communicating wirelessly.  In fact his testimony is in accord with Mobility's position that a cellphone can be tested wirelessly even though one part of the equipment in the room – *a part not being tested* -- may have a wire.   Below is Mr. Venizelos testimony on this matter:



**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**

It's no wonder that Mr. Venezelos did not agree with Verizon's contention that the use of any wire anywhere in the testing site relieves them of liability as their theory is the patent only covers wireless testing.   Such an argument ignores the commonsense reality that all mobile phones do not require a wire by definition; otherwise the phone would be a landline phone.   The purpose of the patent is to test how the cellphone works and the benefits are the cost savings and also efficiencies.  There would be no point at all in testing the effectiveness of a landline phone on a mobile network.  Obviously the landline will not have coverage issues as it does not move. As Dr. Nair says, "wireless means the communications path that is "wireless" must be without wires and through air, and not . . that there can be absolutely no wires or circuits anywhere in the accused system."  (*See* updated Expert Report ¶¶ 113 – 114.)  Please also *see* Nair Decl ¶¶ 168 - 186 where he explains in detail how Verizon practice the patent as they routinely wirelessly test devices.  Also at ¶ 185 of his Declaration, he lists numerous test cases appearing in Verizon documents where Verizon specifically require that testing be done both wired and wirelessly.

VII.    <u>CONCLUSION</u>

The Court should deny Defendant's Motion for Summary Judgment, as material issues of fact preclude summary judgment on every issue Defendant Verizon raised.

Dated:  August 8, 2019                          <u>/s/Michael Machat</u>
                                                Michael Machat
                                                Machat & Associates, PC
                                                8730 W. Sunset Blvd., Ste. 250
                                                West Hollywood, CA 90069
                                                Tel: (310) 860-1833
                                                <u>Michael@machatlaw.com</u>

                                                Attorneys for Plaintiff Mobility Workx

-30-

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

## CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2019, a true and correct copy of the foregoing was filed with the Court via CM/ECF, which will send notification of such filing to all registered participants.

<u>/s Michael Machat</u>
Michael Machat